Gloria CARTER, Appellant,

v.

STATE FARM MUTUAL AUTOMO-
BILE INSURANCE COMPANY and
State Farm Fire and Casualty Compa-
ny, Appellees.

and

State Farm Mutual Automobile
Insurance Company,
Appellant,

v.

Venus Tindle, et al., Appellees.

Nos. 00–CV–848, 00–CV–1536.

District of Columbia Court of Appeals.

Argued Sept. 3, 2002.
Decided Oct. 3, 2002.

Jack Gold, Washington, DC, with whom Stuart Savett and Barbara Podell, Philadelphia, PA, were on the brief for appellant Carter.

Charles Gromly, was on the brief for appellee Tindle.

Michael Budow, Bethesda, MD, with whom Harry Hugh; and Richard Medway, Washington, DC, were on the brief for appellant/appellee State Farm Mutual Automobile Insurance Company, and State Farm Fire and Casualty Insurance.

Before GLICKMAN and WASHINGTON, Associate Judges, and NEWMAN, Senior Judge.

WASHINGTON, Associate Judge:

The question presented in these consolidated cases is whether the District of Columbia's Compulsory/No–Fault Motor Vehicle Insurance Act of 1982[1] ("No–Fault Act"), as amended, makes personal injury protection ("PIP") benefits a secondary source of insurance coverage to a claimant's primary health care coverage provided by a Health Maintenance Organization ("HMO"). In deciding this issue, we must first decide whether HMOs are "insurers" and/or providers of "insurance coverage" under D.C.Code § 31–2406(g) (2001). We conclude, that under D.C.Code § 31–2406(g), an HMO is properly classified as a provider of "insurance coverage" and thus, an insured must exhaust any medical benefits the insured is eligible for under his or her health plan before seeking benefits under a PIP policy. We therefore affirm the ruling in *Carter v. State Farm* and reverse the ruling in *State Farm v. Tindle, et al.*

## I.

Prior to 1982, the District of Columbia (D.C.) followed common-law tort principles in adjudicating automobile accidents.[2] Following a study that reported over forty percent of D.C. residents were without

---

1. The No–Fault Act is codified at D.C.Code §§ 31–2401 to 2403 (2001).

2. Gary A. Stein & William Lightfoot, *Son of No Fault—Analysis of the New Amendments,* WASHINGTON LAWYER, Nov./Dec. 1987, at 46.

automobile insurance under this common-law system,[3] the D.C. Council passed the No–Fault Motor Vehicle Insurance Act of 1982 ("1982 Act"). The purpose of the 1982 Act, which changed the D.C. insurance system from common-law tort principles to a no-fault system,[4] was to create an insurance system, "which provides, at reasonable and affordable rates, adequate protection for" D.C. residents.[5] The 1982 No–Fault Act did not alleviate all the problems it was designed to address. First, following the passage of the 1982 Act, insurance rates steadily climbed rather than declined.[6] Additionally, a portion of the No–Fault Act was deemed unconstitutional.[7] Following these revelations, and in an effort to keep the cost of insurance down, the D.C. Council passed amendments to the 1982 Act.[8]

On June 2, 1986, amendments to the District of Columbia automobile liability statute went into effect. One of the most significant changes under these amendments dealt with personal injury protection benefits ("PIP"). PIP benefits provide "medical and rehabilitation expenses, work loss, and funeral benefits ... to a victim who is an insured or an occupant of the insured's vehicle or of a vehicle which the insured is driving." [9] Prior to the 1986 amendments, drivers were required to have PIP insurance coverage because PIP benefits were the primary source of health insurance coverage when there was an automobile accident. As part of the 1986 amendments, a new provision was added to the D.C.Code. Under this new provision, PIP benefits became optional coverage for automobile owners.[10] The goal of this new provision, according to commentators, was to reduce the cost of automobile insurance by making PIP benefits a secondary source of compensation.[11] Under this scheme, persons injured in an automobile accident must first seek reimbursement from their insurer or under another insurance coverage before seeking reimbursement under their PIP insurance policy.[12] The amendments also added § 31–2406(g) [13] to the D.C.Code. This new provision states:

> (g) *Prohibitions*—A victim is prohibited from claiming personal injury protection benefits under this chapter, other than

3. It was later discovered that this figure was incorrect and the actual number was closer to twenty-three percent. *Id.*

4. *Id.*

5. *Report of the D.C. Council Comm. on Public Serv. and Consumer Affairs on Bill 4–140, Compulsory Motor Vehicle Insurance Act of 1981,* (Feb. 16, 1982) at 2.

6. *See* Stein & Lightfoot, *supra* note 2.

7. *See Dimond v. District of Columbia,* 618 F.Supp. 519 (D.D.C.1984).

8. *See* Stein & Lightfoot, *supra* note 2.

9. D.C.Code § 31–2404(a) (2001). Although the parties in their briefs cited to both the 1981 and 2001 versions of the D.C.Code, this opinion will cite to the most recent version— the 2001 edition.

10. *Report of the D.C. Council Comm. on Consumer and Reg. Affairs on Bill 6–249, Compulsory/No–Fault Motor Vehicle Ins. Act of 1982 Amendments Act of 1985* (Oct. 8, 1985) [hereinafter *1985 Amendments Report*] at 12. Although PIP benefits are optional, insurance companies are still required to offer them to customers. *See also* D.C.Code § 31–2404(a) (2001) (describing PIP benefits as optional insurance coverage).

11. Stein & Lightfoot, *supra* note 2 at 47; *see also 1985 Amendments Report, supra* note 10 at Attachment B (statement of Carol B. Thompson, Director, DCRA).

12. *See 1985 Amendments Report supra* note 10 at 15.

13. Section 31–2406(g) (2001).

to compensate for any deductible, if the victim is eligible for compensation for the loss covered by personal injury protection from another insurer or another insurance coverage, unless the victim has exhausted benefits offered by the insurer or insurance coverage.

The interpretation of § 31–2406(g) is the primary issue in this appeal.

## II.

This appeal consolidates two trial court cases, *Carter v. State Farm Mut. Auto. Ins. Co., et al.*, (Case No. CA–8691–99) and *Tindle v. State Farm Ins. Company* (Case No. CA–4675–99). According to the pleadings submitted by the parties, both cases involve similar facts, which will be briefly reiterated in this opinion.[14]

### A. *Carter v. State Farm Mutual Automobile Ins. Co., et al.*

On January 19, 1998, Gloria Carter was injured in an automobile accident. Carter was insured with State Farm[15] at the time of the accident and had paid for PIP coverage, including medical benefits. Carter received treatment for her injuries from January 21, 1998 until June 12, 1998, incurring medical expenses in the amount of $5,344.50.[16] Carter submitted her accident-related medical bills to Kaiser Permanente, her HMO, which denied reimbursement on the ground that she had not obtained a referral from her primary care physician.[17] Carter then submitted her accident-related medical bills to State Farm for reimbursement under her PIP coverage. State Farm subsequently paid Ms. Carter $3,774.00 in lost wages, but denied her accident-related medical expenses because she was eligible to receive benefits from another source—Kaiser Permanente.

On or about December 9, 1999, Carter filed a seven-count complaint against State Farm in the District of Columbia Superior Court.[18] On January 18, 2000, Carter filed a Motion for Class Certification. State Farm moved to dismiss the case and Carter moved for summary judgement. On

---

14. Other cases in the District of Columbia Superior Court have addressed the issue of whether HMOs are insurers or a source of insurance coverage creating a divided court. *See generally Richardson v. State Farm Ins. Co.*, No. 00–CA–3046 (D.C.Super. Ct. June 22, 2001) (finding that HMOs do not provide insurance coverage or are an "insurer"); *Robinson v. State Farm Ins. Co.*, No. 00–CA–3045 (D.C.Super.Ct. March 28, 2001) (same); *McKnight v. State Farm Mutual Automobile Ins. Co.*, No. 428–95 (D.C.Super.Ct. Nov. 10, 1998) *aff'd McKnight v. State Farm Mutual Automobile Ins. Co.*, No. 428–95 (D.C.Super.Ct. Jan. 6, 2000) (finding that an HMO is an "insurer" or "another insurance coverage"); *Conley v. State Farm Ins. Co.*, No. SC–17002–94 (D.C.Super. Ct. June 9, 1995) (concluding that the language of the statute precludes construing it to include HMOs); *Wheeler v. State Farm Mutual Automobile Ins. Co.*, No. 92–14339 (D.C.Super.Ct. Dec. 15, 1993) (concurring in the holding of *Simmons v. GEICO*); *Simmons v. GEICO*, No. 93–3427 (D.C.Super.Ct. Nov. 1, 1993) (holding that an HMO is not an insurer or a provider of insurance coverage and that the plaintiff is entitled to PIP reimbursement because he was not "eligible" for compensation through his HMO).

15. State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company are collectively referred to as "State Farm."

16. Ms. Carter sought treatment from an orthopedist and underwent an MRI of her lumbar spine.

17. It is unclear why Ms. Carter did not first obtain a referral before seeking medical care.

18. Ms. Carter's complaint alleged (1) breach of contract, (2) breach of the contractual duty of good faith and fair dealing, (3) fraud, (4) negligence, (5) negligent misrepresentation, (6) unjust enrichment, and (7) violation of the D.C. consumer fraud statute.

June 15, 2000, the Honorable John H. Bayly entered an order granting State Farm's motion to dismiss, denying Carter's Motion for Summary Judgement, and denying Carter's Motion for Class Certification. Judge Bayly ruled that Kaiser Permanente, an HMO, qualifies as an insurer, or as a source of insurance coverage and that "PIP benefits are a secondary source of benefits, available to a plaintiff only after she has availed herself of 'benefits offered by the insurer or insurance coverage.'" *Carter v. State Farm Mutual Auto. Ins. Co.,* No. 99–CA–8691 (D.C.Super. Ct. June 15, 2000). The court concluded that because Carter did not exhaust the medical benefits provided by her HMO before receiving treatment from a health care provider not affiliated with her HMO, State Farm was not required to reimburse her for accident-related medical expenses. Ms. Carter now appeals this decision.

*B. Tindle, et al. v. State Farm Ins. Co.*

On or about July 7, 1996, Venus Tindle and Trina Tanner were injured in an automobile accident. At the time of the accident Tindle was a member of the Humana HMO and Tanner was a member of the Kaiser Permanente HMO. Both Tindle and Tanner were also covered by Tindle's insurance policy with State Farm for PIP benefits. Following the accident, both Tindle and Tanner were initially treated by the doctors through their respective HMOs. Following this initial treatment, both Tindle and Tanner sought medical treatment from health care providers who were not participants in their HMOs.[19] Tindle incurred accident-related medical expenses of $5,416.00 and Tanner incurred accident-related medical expenses of $4,371.00. Both Tindle and Tanner sought

reimbursement from their respective HMOs, but were denied because their treatment was received from out-of-network providers. Tindle and Tanner then made claims for payment of PIP benefits from State Farm, which were denied because Tindle and Tanner did not seek treatment through their respective HMO plans as their primary source of insurance coverage. On July 6, 1999, Tindle and Tanner filed a complaint with the District of Columbia Superior Court alleging that State Farm refused to pay certain accident-related medical PIP benefits to Tindle and Tanner. Both State Farm and Tindle and Tanner filed motions for summary judgment.

On October 26, 2000, the Honorable Rafael Diaz granted summary judgment in favor of Tindle and Tanner and denied State Farm's Motion for Summary Judgment. Judge Diaz found that "[t]he plain meaning of 'insurance' does not include HMOs"; therefore, the PIPs benefits from State Farm were the primary source of insurance. Based upon this finding, Judge Diaz ordered that Tindle and Tanner's accident-related medical expenses should be reimbursed by State Farm. *Tindle v. State Farm Ins. Company* Case No. 4675–99 (D.C.Super.Ct. Oct. 27, 2000). State Farm now appeals this decision.

### III.

This case is primarily concerned with statutory construction and we review the trial court's construction of the D.C.Code *de novo. See, e.g., District of Columbia, et al. v. Gallagher,* 734 A.2d 1087, 1090 (D.C.1999); *Ashton Gen. P'ship, Inc. v. Federal Data Corp.* 682 A.2d 629, 632 (D.C.1996). The outcome of this case turns on whether or not an HMO

---

**19.** It is unclear from the pleadings why Tindle and Tanner elected to receive treatment outside their HMOs.

is an "insurer" or provides "insurance coverage" under D.C.Code § 31–2406(g) (2001). Section 31–2406(g) states:

> (g) *Prohibitions*—A victim is prohibited from claiming personal injury protection benefits under this chapter, other than to compensate for any deductible, if the victim is eligible for compensation for the loss covered by personal injury protection from *another insurer* or *another insurance coverage,* unless the victim has exhausted benefits offered by the insurer or insurance coverage.

D.C.Code § 31–2406(g) (2001) (emphasis added).

 When construing a statute, we must first examine the statute itself to determine whether the language is ambiguous. We start by looking to the plain meaning of the statute to determine the drafter's intent. "The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used." *United States v. Goldenberg,* 168 U.S. 95, 102–03, 18 S.Ct. 3, 42 L.Ed. 394 (1897); *accord District of Columbia v. Gallagher,* 734 A.2d 1087 (D.C.1999). Furthermore, "the words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them." *Davis v. United States,* 397 A.2d 951, 956 (D.C.1979).

 While we first employ the plain meaning rule to our task of statutory interpretation, we have acknowledged that in certain circumstances it is appropriate to look beyond even the plain and unambiguous language of a statute to understand the legislative intent.

First, even when the words of a statute have "superficial clarity," a review of the legislative history or an in-depth consideration of alternative constructions that could be ascribed to statutory language may reveal ambiguities that the court must resolve. Second, "the literal meaning of a statute will not be followed when it produces absurd results." Third, whenever possible, the words of a statute are to be construed to avoid "obvious injustice." Finally, a court may refuse to adhere strictly to the plain wording of a statute in order "to effectuate the legislative purpose," as determined by a reading of the legislative history or by an examination of the statute as a whole.

*Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 754 (D.C.1983) (citations omitted). However, "[t]hese exceptions to the plain meaning rule should not, however, be understood to swallow the rule completely." *Id.* at 755. This court has noted that there are "strong policy reasons for maintaining the certainty, fairness, and respect for the legal system that the plain meaning rule engenders in most instances." *Id.* Therefore, this court will "look beyond the ordinary meaning of the words of a statute only where there are 'persuasive reasons' for doing so." *Id.* (quoting *Tuten v. United States,* 440 A.2d 1008, 1013 (D.C.1982)).

### 1. Is an HMO an "insurer" under Section 31–2406(g)

█ State Farm argues that "insurer," as used in § 31–2406(g), refers to *health* insurers, which includes HMOs. In support of their argument, State Farm directs us to other sections of the D.C.Code specifically defining HMOs as health insurers. However, while State Farm is correct that other provisions of the code include HMOs as a type of insurer, § 31–2406(g) does not. Section 31–2402 provides definitions of terms that are used throughout chapter 24, including a definition of "insurer." Section 31–2402(11) defines "insurer" as "any person, company, or professional association licenced in the District of Columbia that

provides motor vehicle liability protection or any self insurer." The definition of "insurer" is not, on its face, ambiguous. Since the plain meaning is clear and the literal meaning of the statute will not lead to an absurd result or injustice, we are satisfied that HMOs do not fall within this statutory definition. This court will not read into an unambiguous statute language that is clearly not there. Supplying statutory language "transcends the judicial function." *Iselin v. United States*, 270 U.S. 245, 251, 46 S.Ct. 248, 70 L.Ed. 566 (1926).

### 2. Is an HMO a provider of "insurance coverage" under Section 31–2406(g)

■ Unlike the clear definition provided in the D.C.Code for "insurer," the Code provides no definition for "insurance coverage." When examining a statute to determine the scope of a word, the court first looks to the plain meaning of the word; "it is axiomatic that 'the words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them.'" *Peoples Drug Stores, Inc.* 470 A.2d at 753 (quoting *Davis v. United States*, 397 A.2d 951, 956 (D.C. 1979)). In order to determine what the legislature meant by the terms "insurance coverage" we consider the normal and ordinary usage of that term [20] and review the statutory scheme enacted to regulate HMOs.[21]

### a. HMOs are ordinarily construed as being providers of insurance

■ In analyzing whether HMOs are ordinarily understood to be a form of "insurance coverage" it is important that we begin with a discussion of what constitutes insurance. In *Group Life & Health Ins. Co. v. Royal Drug Co.*, the U.S. Supreme Court provided guidance in understanding the elements of insurance. 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). The Court noted that:

> [t]he primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk. "It is characteristic of insurance that a number of risks are accepted, some of which involve losses, and that such losses are spread over all the risks so as to enable the insurer to accept each risk at a slight fraction of the possible liability upon it."

*Id.* at 211, 99 S.Ct. 1067 (quoting 1 G. COUCH, CYCLOPEDIA OF INSURANCE LAW § 1:3 (2d ed.1959)).

■ The Court also noted that the risk is on the company issuing the contract. *Id.* Thus, the first step in determining if an HMO is a type of insurance coverage is to determine if the HMO spreads risk among various policyholders.

In *Pegram v. Herdrich*, 530 U.S. 211, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000), Justice Souter, writing for a unanimous Court, discussed the health care system in the United States and in particular how HMOs function.

> Beginning in the late 1960's, insurers and others developed new models for health-care delivery, including HMOs. The defining feature of an HMO is re-

---

**20.** After examining the legislative history of the statute, this court determines it was without "probative value ... [and] should not be permitted to control the customary meaning" of the terms. *Peoples Drug Store, Inc. v. District of Columbia*, 470 A.2d 751, 755 (D.C. 1983) (citation omitted).

**21.** "It is a canon of statutory interpretation that one looks at the particular statutory language within the context of the whole legislative scheme when legislative intent is to be determined." *Citizens Ass'n of Georgetown, et al. v. Zoning Comm'n of the District of Columbia*, 392 A.2d 1027, 1033 (D.C.1978).

ceipt of a fixed fee for each patient enrolled under the terms of a contract to provide specified health care if needed. The HMO thus assumes the *financial risk* of providing the benefits promised: if a participant never gets sick, the HMO keeps the money regardless, and if a participant becomes expensively ill, the HMO is responsible for the treatment agreed upon even if its cost exceeds the participant's premiums.

*Id.* at 218–19, 120 S.Ct. 2143 (citations omitted) (emphasis added).

It is evident from Justice Souter's discussion of HMOs that they are organizations that fall within the *Group Life & Health Ins. Co.* requirement for insurance. As Justice Souter noted, HMOs accept financial risk by providing benefits. This spreading of risk over a large number of individuals (members of the HMO) is the same type of conduct that the Court in *Group Life & Health* noted would constitute insurance.

Several other courts have also determined that HMOs spread and underwrite risk. *Express Scripts, Inc. v. Wenzel*, 262 F.3d 829, 835–36 (8th Cir.2001) (concluding that "HMOs both spread and underwrite risk"); *Kentucky Ass'n of Health Plans, Inc. v. Nichols*, 227 F.3d 352, 364–65 (6th Cir.2000) (noting that HMOs are in the business of insurance); *Corporate Health Ins., Inc. v. Texas Dep't of Ins.*, 215 F.3d 526, 538 (5th Cir.2000) (recognizing that HMOs perform both functions of health care insurers and as medical care providers); *Washington Physicians Service Assoc. v. Gregoire*, 147 F.3d 1039, 1046 (9th Cir.1998) (noting that "HMOs function the same way as a traditional health insurer: The policyholder pays a fee for a promise of medical services in the event that he should need them. It follows that HMOs ... are in the business of insurance.").[22] In addition, this court has described HMOs as providing both "health care and insurance to its members." *George Washington Univ. v. Scott*, 711 A.2d 1257, 1258 (D.C.1998)[23] and the D.C.Code requires HMOs to accept risk.[24]

Despite the almost universal agreement that HMOs provide insurance coverage, Carter points to a decision binding upon us under *M.A.P. v. Ryan*, 285 A.2d 310 (D.C. 1971) that was issued in 1939 by the U.S. Court of Appeals for the District of Columbia Circuit. In *Jordan v. Group Health*, 71 App. D.C. 38, 107 F.2d 239, 243, (1939), the D.C. Circuit held that Group Health, a group health plan, did not provide insurance to its members. The health plan presented in that case, however, is clearly distinguishable from the HMOs that exist today. In that case, the court found that the health plan more closely resembled a consumer cooperative than a provider of insurance. The court noted that Group Health assumed no liability because they issued no formal policies, certificates, or contracts to members and, Group Health

---

**22.** While each of these cases analyze a statute that is slightly different from the D.C.Code this court finds the reasoning of these courts persuasive.

**23.** *Scott* was primarily concerned with the interpretation of a contract between George Washington University Health Plan, an HMO, and Scott. The court described the contract between the parties as an insurance contract. *Scott*, 711 A.2d at 1260. In addition, the court described the health plan as "a health maintenance organization or 'prepaid comprehensive medical plan' providing health care and insurance to its members." *Id.* at 1258.

**24.** Under current law in the District of Columbia, HMOs are required to accept risk, § 31–3402(a) of the D.C.Code states that "[a]ll health maintenance organizations shall, as a condition of certification, agree to accept the risk for the provision of services ...."

had no "agreement or binding obligation to provide services" or ensure that services were supplied. *Id.* Thus, the health plan addressed in *Jordan* is clearly distinguishable from the health maintenance organizations presented in this case. As noted in *Corporate Health Ins., supra,* 215 F.3d at 536, today, HMOs provide both health care services and insurance coverage.

### b. Statutory Scheme

Our review of the statutory scheme regulating HMOs strongly suggests that the legislature intended to follow the normal and ordinary usage of the term HMO, and view HMOs as a source of insurance coverage. First, HMOs are regulated under the Insurance and Securities title of the D.C.Code (Title 31) and the provisions relating to HMOs are specifically addressed in Subtitle IV, entitled "Health and Related Insurance." These provisions require HMOs to (1) obtain a certificate of authority from the Commissioner of Insurance and Securities ("Commissioner"); [25] (2) receive prior approval of contracts and coverage policy forms from the Commissioner; [26] and (3) have all rates approved by the Commissioner. [27] Finally, both HMOs and other insurers are required to pay into the Insurance Regulatory Trust Fund. [28] Second, under other provisions in Title 31, HMOs have been defined as being an "insurer," [29] "health insurer," [30] and as providing "health insurance policies." [31]

Carter argues that the Council's failure to include the word "insurance," "indemnification," or "payment of indemnity" [32] in the definition of HMO reflects the Council's specific intent not to define HMOs as providers of insurance. Carter attempts to support this proposition by pointing to other provisions of the code that define HMOs only as providers of prepaid health care and not providers of insurance coverage. As we previously pointed out, however, the District of Columbia: (1) regulates HMOs in the same title and subtitle of the code as other insurance programs; (2) defines HMOs as providers of insurance; and (3) regulates HMOs and other insurance providers similarly.

The above cited cases, along with the statutory scheme enacted by the Council, lead this court to conclude that an HMO is a provider of "insurance coverage" under § 31–2406(g). In reaching this conclusion we are satisfied that the purpose of the No–Fault Act will not be compromised.

### IV.

We also disagree with Carter's remaining arguments in support of her contention that HMOs are not insurers or providers of insurance coverage. First, Carter contends that HMO members are not "eligible for compensation for the loss covered by personal injury protection from another insurer or another insurance provider" and thus § 31–2406(g) cannot apply. Carter asserts that since HMOs provide medical

---

**25.** *Compare* § 31–3402(a) *with* § 31–2502.02.

**26.** *Compare* § 31–3407(e)–(g) *with* § 31–2502.27.

**27.** *Compare* § 31–3415 *with* § 31–2703.

**28.** *See* § 31–1202.

**29.** D.C.Code § 31–1601(7) (2001) (defining "insurer" to include HMOs).

**30.** Section 31–3301.01(22) (defining "health insurer" to include HMOs); *see also* § 31–3001(2) (same).

**31.** Section 31–2901(4) (defining "health insurance policy" to include HMOs).

**32.** The Council defines health, accident and life insurance as the "payment for indemnity." § 31–5202.

services and treatment on a prepaid basis, the member does not suffer any economic loss,[33] which can be compensated. We agree with Judge Bayly that the fact that an HMO "would have supplied services directly to plaintiff, rather than have paid her their value or cost, does not alter the conclusion that plaintiff was 'eligible for compensation for the loss' that would otherwise have been made good by an insurance company." *Carter v. State Farm Mutual Automobile Insurance Co.*, No. 99–CA–8691 (D.C.Super. Ct. June 15, 2000). To further support Judge Bayly's decision, compensation as defined by Black's Law Dictionary means to "restore an injured party to his former position." BLACK'S LAW DICTIONARY 283 (6th ed.2000). Compensation is commonly understood to mean payment for out-of-pocket expenses, HMOs compensate by reimbursing for co-payments and deductibles. We also read this definition to include compensation through services. HMOs provide health care services—a form of compensation.

Carter also argues that according to the statute, HMOs can only be liable if they provide personal injury protection benefits as defined in § 31–2404(a)(1). Specifically, Carter asks this court to read the statute so that "personal injury protection" modifies "another insurer" or "another insurance coverage," thus restricting the type of insurer's and insurance coverage under the statute only to providers of PIP coverage. This court declines to read the statute so narrowly. We read § 31–2406(g) as allowing access to PIP benefits only to the extent that another insurer or another insurance coverage does not cover some or all of the expenses that the PIP benefits would have covered. Finally, Carter claims that if HMOs are insurers or provide insurance coverage then the premiums she is paying will never amount to paid benefits. This claim overlooks two important points. First, PIP benefits cover work loss and death benefits in addition to medical related expenses. This court should point out that Carter has received benefits under the PIP policy for lost wages. Second, PIP benefits are optional coverage that can be tailored to meet the needs of the insured. If a person has health insurance that is not comprehensive, then that individual may select a PIP policy that provides maximum protection. Conversely, if a person has a health plan that provides maximum health benefits, that individual may select a PIP policy with less coverage or may waive PIP coverage altogether.

### Conclusion

Based on the foregoing reasons, this court holds that health maintenance organizations are providers of "insurance coverage" under § 31–2406(g). Since PIP benefits are a secondary source of insurance coverage in the Code, Carter, Tindle, and Tanner were required to exhaust the benefits available to them under their respective HMO plans before seeking reimbursement under PIP. We therefore affirm the ruling in *Carter v. State Farm* and reverse the ruling in *State Farm v. Tindle, et al.*

*So ordered.*

---

**33.** Section 31–2401(13).